# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADEL HAMLILY,** | |
| **Petitioner,** | |
| **v.** | Civil Action No.  05-0763 (JDB) |
| **BARACK OBAMA, et al.,** | |
| **Respondents.** | |
| **WALEED SAEED BN SAEED ZAID, et al.,** | |
| **Petitioners,** | |
| **v.** | Civil Action No.  05-1646 (JDB) |
| **BARACK OBAMA, et al.,** | |
| **Respondents.** | |
| **ABDUL HAMID ABDUL SALAM AL-GHIZZAWI,** | |
| **Petitioner,** | |
| **v.** | Civil Action No.  05-2378 (JDB) |
| **BARACK OBAMA, et al.,** | |
| **Respondents.** | |
| **MOAMMAR BADAWI DOKHAN,** | |
| **Petitioner,** | |
| **v.** | Civil Action No.  08-0987 (JDB) |
| **BARACK OBAMA, et al.,** | |
| **Respondents.** | |
| **SHAWALI KHAN,** | |
| **Petitioner,** | |
| **v.** | Civil Action No.  08-1101 (JDB) |
| **BARACK OBAMA, et al.,** | |
| **Respondents.** | |

**MUIEEN ADEEN JAMAL ADEEN ABD AL F. ABD AL SATTAR**

    **Petitioner,**

      **v.**

**BARACK OBAMA, et al.,**

    **Respondents.**

**Civil Action No.  08-1236 (JDB)**

## MEMORANDUM OPINION

Petitioners are detainees at the United States Naval Base at Guantanamo Bay who have challenged the legality of their detentions by seeking writs of habeas corpus.  The issue presently before the Court is a threshold legal question in these habeas proceedings:  what is the scope of the government's authority to detain these, and other, detainees pursuant to the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), as informed by the law of war?[1]  In Hamdi v. Rumsfeld, 542 U.S. 507 (2004), the Supreme Court acknowledged that the district courts would have to address this issue in a piecemeal fashion by delimiting "[t]he permissible bounds" of the government's detention authority "as subsequent cases are presented to them."[2]  Id. at 522 n.1.  Since Hamdi was decided, the Supreme Court has not revisited this

---

[1] Although the government has previously asserted that petitioners' detentions are justified, at least in part, by the President's Article II powers as Commander in Chief, see Mem. in Support of Gov't's Definition of Enemy Combatant at 5-7 (Jan. 7, 2009), it no longer makes such an assertion, see Resp'ts' Mem. Regarding the Gov't's Detention Authority ("Resp'ts' Mem.") at 1 (Mar. 13, 2009) ("The United States bases its detention authority . . . on the [AUMF] . . . [as] informed by principles of the laws of war.").

[2] In Hamdi, the Supreme Court spoke of the lower courts defining the permissible bounds of the "legal category of enemy combatant."  542 U.S. at 522 n.1.  In attempting to define the scope of its authority to detain a class of individuals held at Guantanamo, the new Administration has ceased using the term "enemy combatant."  Irrespective of nomenclature, however, this Court's inquiry into the scope of the government's detention authority is essentially the same as that envisioned by the Supreme Court in Hamdi.

question and no court of appeals has clarified the issue, although one has tried.[3]  And it is only

recently -- in the wake of the Supreme Court's decision in <u>Boumediene v. Bush</u>, 128 S. Ct. 2229

(2008) -- that other judges of this Court have begun to examine the "permissible bounds" of the

government's authority to detain those being held at Guantanamo.  It is with this limited

guidance, then, that the Court undertakes its inquiry.

## BACKGROUND

On March 13, 2009, in response to a prior order of this Court, the government submitted

a refinement of its position with respect to its authority to detain those individuals being held at

Guantanamo.[4]  The government proposed the following "definitional framework":

> The President has the authority to detain persons that the President determines
> planned, authorized, committed, or aided the terrorist attacks that occurred on
> September 11, 2001, and persons who harbored those responsible for those
> attacks.[5]  The President also has the authority to detain persons who were part of,
> or substantially supported, Taliban or al Qaida forces or associated forces that are
> engaged in hostilities against the United States or its coalition partners, including
> any person who has committed a belligerent act, or has directly supported
> hostilities, in aid of such enemy armed forces.

Resp'ts' Mem. at 2.[6]  The government contends that its proposed framework is based principally

upon the AUMF, which authorizes the President "to use all necessary and appropriate force

---

[3] <u>See</u> <u>al-Marri v. Pucciarelli</u>, 534 F.3d 213 (4th Cir. 2008).

[4] For the government's prior position, see <u>Hamlily v. Obama</u>, Civ. A. No. 05-0763 (ECF # 126) (Mem. in Support of Gov't's Definition of Enemy Combatant).

[5] The first sentence of the government's proposal is taken almost verbatim from the AUMF itself and concerns the President's authority to use force against, and hence to detain under <u>Hamdi</u>, 542 U.S. at 521, those individuals who (i) were responsible for the September 11 attacks or (ii) harbored those who were responsible for the attacks.  There is no debate that the President has authority to detain such individuals.

[6] Unless otherwise noted, the parties' memoranda cited herein were filed in all of the above-captioned cases.  For ease of reference, the Court will cite to the parties' memoranda with an abbreviated description of the filing.

against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. 224, 224. Acknowledging the Supreme Court's decision in Hamdi, the government also asserts that "[t]he detention authority conferred by the AUMF is necessarily informed by principles of the laws of war." Resp'ts' Mem. at 1 (citing Hamdi, 542 U.S. at 521).  According to the government, then, because the law of war has evolved primarily in the context of international armed conflicts between nations, the President has the authority to detain "those persons whose relationship to al-Qaida or the Taliban would, in appropriately analogous circumstances in a traditional international armed conflict, render them detainable." Id.

Not surprisingly, petitioners are highly critical of the government's framework.  They assert that the government's claimed detention authority far exceeds that which is permitted by the AUMF and the Constitution and does considerable violence to fundamental principles of the law of war.  See Pet'rs' Joint Mem. in Reply to Resp'ts' Mem. of Mar. 13, 2009 ("Pet'rs' Mem.") at 1-2 (Mar. 27, 2009).  Specifically, petitioners contend that the government has developed "new detention standards by 'analogy to' the law of war" in "an attempt to create a new legal standard to deal with what [it] contend[s] are new and different circumstances." Id.  Such an attempt is, in petitioners' view, contrary to both domestic and international law because neither body of law permits the government "to detain individuals based merely on some unspecified degree of association with persons or entities targeted by the AUMF." Id. at 2.  Petitioners assert, then, that "[t]he Court should follow Hamdi's lead, and rule that the scope of the executive's detention power in these cases is that authorized by the traditional law of war." Id.

That, according to petitioners, encompasses only "individuals who were lawful combatants under Article 4 of the Geneva Conventions (members of an armed force of a State or other militia as described in Article 4),[7] and civilians who become unlawful combatants by reason of their direct participation in hostilities as that standard is understood in international law." Id. at 5.

To aid its consideration of these and other related issues, the Court held a hearing on April 17, 2009.[8] Less than a week later, Judge Walton issued his opinion in Gherebi v. Obama, Civ. A. No. 04-1164, 2009 WL 1068955 (D.D.C. Apr. 22, 2009). Gherebi concerns the same question at issue here and Judge Walton's thorough and thoughtful opinion advances this Court's analysis considerably.[9] He concluded that "the President has the authority to detain persons who were part of, or substantially supported, the Taliban or al-Qaeda forces that are engaged in hostilities against the United States or its coalition partners, provided that the terms 'substantially supported' and 'part of' are interpreted to encompass only individuals who were members of the enemy organization's armed forces, as that term is intended under the laws of war, at the time of their capture." Id. at *24. In reaching that conclusion, the court noted that it "shares petitioners' distaste for the government's reliance on the term 'support' at all, laden as it is with references to domestic criminal law rather than the laws of war that actually restrict the President's discretion in this area." Id. at *23. Nevertheless, Gherebi adopted the government's proposed definitional framework largely because it found, after careful analysis, that it "comports with the laws of

---

[7] See Geneva Convention Relative to the Treatment of Prisoners of War art. 4, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (the "Third Geneva Convention").

[8] Citations to the hearing transcript ("Tr.") refer to the volume for the April 17, 2009 proceedings unless otherwise noted.

[9] For a detailed discussion of the Executive's evolving views on the scope of the detention authority since the passage of the AUMF, and the judiciary's attempts to disentangle them, see Gherebi, 2009 WL 1068955, at *1-9.

war."  Id. at *24.

## ANALYSIS

A starting point for the analysis of this issue is the premise recently articulated by another

judge of this Court:  "I do not believe . . . that it is the province of the judiciary to draft

definitions.  It is our limited role to determine whether definitions crafted by either the Executive

or the Legislative branch, or both, are consistent with the President's authority under the

[AUMF]."[10]  Boumediene v. Bush, 583 F. Supp. 2d 133, 134 (D.D.C. 2008) (emphasis in

original).  This approach is appropriate, if not required, given the singular role of the Executive

in matters of foreign affairs and the deference that he is customarily given by courts when

resolving matters in that realm.  See, e.g., Munaf v. Geren, 128 S. Ct. 2207, 2218 (2008)

(recognizing that "'courts traditionally have been reluctant to intrude upon the authority of the

Executive in military and national security affairs'") (quoting Dep't of Navy v. Egan, 484 U.S.

518, 530 (1988)); Jama v. Immigration and Customs Enforcement, 543 U.S. 335, 348 (2005)

(stating that there is a "customary policy of deference to the President in matters of foreign

affairs").  Although there is some disagreement regarding the extent of the deference owed the

Executive in this setting, it is beyond question that some deference is required.  Compare Eric A.

Posner & Cass R. Sunstein, Chevronizing Foreign Relations Law, 116 Yale L.J. 1170, 1220

(2007) (arguing that with respect to the AUMF, "the President should be taken to have the

authority to interpret ambiguities as he chooses"), with Derek Jinks & Neal Katyal, Disregarding

---

[10] Judge Leon also asserted that it was his job to determine whether the proposed
definition was consistent with the President's war powers under Article II of the Constitution.
Boumediene, 583 F. Supp. 2d at 134.  As mentioned above, however, the government no longer
asserts that the President's Article II powers as Commander in Chief justify the detention
authority claimed here.  Judge Leon's decision preceded the government's refinement of its
position on the scope of its detention authority.

Foreign Relations Law, 116 Yale L.J. 1230, 1234 (2007) (acknowledging that under existing doctrines deference is warranted in some circumstances, but arguing that "increased judicial deference to the executive in the foreign relations domain is inappropriate").

With that in mind, the Court turns to the government's proposed framework. Although this Court concurs in much of the reasoning and conclusions of Gherebi, it does not agree with the decision to adopt the government's framework in its entirety.[11] Specifically, the Court rejects the concept of "substantial support" as an independent basis for detention. Likewise, the Court finds that "directly support[ing] hostilities" is not a proper basis for detention. In short, the Court can find no authority in domestic law or the law of war, nor can the government point to any, to justify the concept of "support" as a valid ground for detention. The Court does not accept the government's position in full, then, even given the deference accorded to the Executive in this realm, because it is ultimately the province of the courts to say "what the law is," Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), and in this context that means identifying the "permissible bounds" of the Executive's detention authority, Hamdi, 542 U.S. at 522 n.1. Detention based on substantial or direct support of the Taliban, al Qaeda or associated forces, without more, is simply not warranted by domestic law or the law of war.

With the exception of these two "support"-based elements, however, the Court will adopt the government's proposed framework, largely for the reasons explained in Gherebi. The AUMF and the law of war do authorize the government to detain those who are "part of" the "Taliban or al Qaida forces." Because the AUMF permits the President "to use all necessary and appropriate force" against "organizations" involved in the September 11 attacks, it naturally follows that

_____

[11] The Court recognizes that although Gherebi adopted the government's framework, it did so subject to a comprehensive interpretation of that standard. Gherebi, 2009 WL 1068955, at *17-24.

force is also authorized against the members of those organizations.  In light of <u>Hamdi</u> and subsequent cases, such force includes the power to detain.  That is consistent with the law of war principles governing non-international conflicts.  The authority also reaches those who were members of "associated forces," which the Court interprets to mean "co-belligerents" as that term is understood under the law of war.  Lastly, the government's detention authority covers "any person who has committed a belligerent act," which the Court interprets to mean any person who has directly participated in hostilities.  But while the Court concludes that the concepts of "substantial support" and "direct support" are not, under the law of war, independent bases for detention, evidence tending to demonstrate that a petitioner provided significant "support" is relevant in assessing whether he was "part of" a covered organization (through membership or otherwise) or "committed a belligerent act" (through direct participation in hostilities).

**I.     Authority to detain "persons who were part of, or substantially supported, Taliban or al Qaida forces or associated forces"**

**A.     "Part of . . . Taliban or al Qaida forces or associated forces"**

At the April 17 hearing, the government admitted that, as written, "the 'part of' [portion] of the test is the most important, and it's going to do the most work in most of the cases."  Tr. at 32, 42.  Indeed, the focus of the government's framework is on membership in the organizations responsible for the September 11 attacks.  Resp'ts' Mem. at 2-8.  Hence, the government asserts that the AUMF, as interpreted through the lens of historical practice and international law, "authorizes the use of necessary and appropriate military force against members of an opposing armed force, whether that armed force is the force of a state or the irregular forces of an armed group like al-Qaida."  <u>Id.</u> at 5.  Accordingly, and in light of the Supreme Court's construction of "'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict," <u>Hamdi</u> 542 U.S. at 521, the government claims the authority to detain

individuals who were "members of enemy forces even if 'they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of military operations.'"  Resp'ts' Mem. at 5-6 (quoting Ex parte Quirin, 317 U.S. 1, 38 (1942)).  Thus, "[j]ust as members of state armed forces may be detained for the duration of hostilities in order to prevent them from being used by the enemy in a belligerent capacity, so, too, persons who are part of al-Qaida or the Taliban armed forces may be detained until the cessation of hostilities." Gov't's Response to Pet'rs' Joint Mem. Relating to Detention Authority ("Gov't's Response") at 6 (Apr. 14, 2009).  Moreover, to assess who is, or is not, a "part of" those irregular forces, the government argues that the Court must examine not only formal indicia of membership (e.g., an oath of loyalty), but also more functional evidence of membership (e.g., training at an al Qaeda camp, staying at an al Qaeda guesthouse, or taking up a position with an enemy force in the field).  Resp'ts' Mem. at 6-7; Tr. at 14-23 (advocating a functional test).

Petitioners flatly reject the government's framework, insisting that detention based solely on membership in an organization such as al Qaeda is completely antithetical to the law of war.[12] Such an approach is prohibited by the law of war, the argument goes, because it represents

---

[12] Petitioners also assert that the government's framework raises non-delegation and separation of powers concerns.  See Pet'rs' Mem. at 9-19.  According to petitioners, Hamdi concluded that "detention consistent with historic practice was necessarily implicit in Congress's authorization to use military 'force.'"  Id. at 10.  What was not implicit in the AUMF, petitioners argue, was "some broad new grant of authority to the President to detain whatever individuals he chose to detain pursuant to whatever standards he chose to adopt."  Id.  The Court need not reach petitioners' argument that the AUMF represents an impermissible delegation of lawmaking authority to the Executive because -- as interpreted and limited by the Court for these habeas proceedings, consistent with the law of war -- the government's proposed framework does not implicate the non-delegation or separation of powers concerns raised by petitioners.  They view the government's framework as a break from traditional law of war principles requiring explicit authorization from Congress.  But contrary to petitioners' view, the government's framework is generally consistent with the law of war and the detention authority recognized by this Court is that which the AUMF, in light of Hamdi and the law of war, allows.

detention based on status rather than conduct, which is impermissible in the context of the current non-international armed conflict.  Pet'rs' Mem. at 5-9.  Petitioners also contend that status-based detentions ignore the distinction between combatants and civilians in traditional international armed conflicts.  Id.  In their view, that distinction -- which is fundamental to the law of war -- leads to the conclusion that the only persons who are detainable in the current armed conflict are "individuals who were lawful combatants under Article 4 of the Geneva Conventions (members of an armed force of a State or other militia as described in Article 4), and civilians who become unlawful combatants by reason of their direct participation in hostilities as that standard is understood in international law."  Id. at 5.  As a practical matter, then, the only individuals who would be detainable under petitioners' framework are civilians who directly participate in hostilities (i.e., individuals who would be detainable based upon their conduct, not their status), because by definition no "lawful combatants" fight on behalf of the enemy in the current non-international armed conflict.  Id. at 2-5; Tr. at 50-54 (discussing the distinction between civilians and combatants).

Before addressing the parties' arguments regarding the law of war, and any restrictions they place upon the scope of the government's detention authority, one must first assess the source of this authority under domestic law -- the AUMF.  The AUMF authorizes the President "to use all necessary and appropriate force against those . . . organizations . . . he determines planned, authorized, committed, or aided" the September 11 attacks "to prevent any future acts of international terrorism against the United States by such . . . organizations . . . ."  Pub. L. No. 107-40, § 2a, 115 Stat. 224, 224.  By authorizing the use of force against the "organizations" responsible for the September 11 attacks, Congress also, necessarily, authorized the use of force

(including detention) against their members.[13]  See Gherebi, 2009 WL 1068955, at *16

("Congress authorized the same use of military force, and thus conferred upon the President the

same degree of detention authority, with respect to 'organizations' responsible for the 9/11

attacks as it did with respect to the 'nations' responsible for those attacks."); al-Marri, 534 F.3d at

261 (Traxler, J., concurring) ("[T]he AUMF plainly authorizes the President to use all necessary

and appropriate force against al Qaeda.  I believe this necessarily includes the detention of al

Qaeda operatives who associate with the enemy, be that the al Qaeda organization or the

Taliban."); Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on

Terrorism, 118 Harv. L. Rev. 2047, 2109 (2005) (hereinafter "Bradley & Goldsmith") ("The

AUMF obviously applies to the terrorist organization known as al Qaeda, since this organization

was directly responsible for the September 11 attacks.  This means that Congress has authorized

the President to use force against all members of al Qaeda, including members who had nothing

to do with the September 11 attacks and even new members who joined al Qaeda after

September 11.").  Further, given that the AUMF was passed in response to the September 11

attacks "to prevent any future acts of international terrorism against the United States by . . .

[the] organizations" responsible for those attacks, it would contravene Congress's clear purpose

to conclude that the AUMF failed to authorize the use of force, including detention, against

members of those organizations.  See al-Marri, 534 F.3d at 286 (Williams, J., concurring in part

and dissenting in part) (stating that a member of al Qaeda is "someone squarely within the

purposes of the AUMF, which was passed to target organizations, like al Qaeda, responsible for

---

[13] As noted in Gherebi:  "[D]etention is an exercise of the state's 'right to use force,' and often a required one at that.  And it is in this sense that detention is, as the plurality noted in Hamdi, 'a fundamental incident of waging war.'"  2009 WL 1068955, at *16 (quoting Hamdi, 542 U.S. at 519).

the September 11 attacks and to prevent future terrorist attacks") (emphasis in original).

Of course, the AUMF's broad authorization does not resolve the scope of the government's detention authority -- it only establishes that it reaches members of "organizations" covered by the statute.  The question, then, is whether this authority is consistent with the law of war.  Here, Judge Walton's opinion in <u>Gherebi</u> provides valuable guidance.  Petitioners argue, just as they did in <u>Gherebi</u>, that because they cannot be classified as "combatants" under Article 4(A) of the Third Geneva Convention or Article 43 of Additional Protocol I, they must be "civilians" -- a classification that means they are not subject to military force (<u>i.e.</u>, detention) "unless and for such time as they take a direct part in hostilities."  Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), arts. 51(1), 51(3), June 8, 1977, 1125 U.N.T.S. 3 (hereinafter "Additional Protocol I").  Putting aside for the moment the restrictive definition of "direct participation"[14] advanced by petitioners, their advocacy of a detention authority based upon the dichotomy between combatants and civilians in traditional international armed conflicts is flawed.  To begin with, the U.S. conflict with al Qaeda is a non-international armed conflict;

_____

[14] Although petitioners' counsel retreated from the position that the government could only detain civilians captured "for such time as" they were directly participating in hostilities, petitioners still maintain that active and direct participation in hostilities against the United States is required for detention.  <u>See</u> Tr. at 59-67 (discussing hypothetical examples of "direct participation").  In petitioners' view, "direct participation" should be defined as "immediate and actual action on the battlefield likely to cause harm to the enemy because there is a direct causal relationship between the activity engaged in and the harm done to the enemy."  Pet'rs' Mem. at 4. The definition of "direct participation in hostilities" is, at present, unsettled, <u>see</u> Int'l Comm. of the Red Cross, Report: Direct Participation in Hostilities (Dec. 31, 2005), http://www.icrc.org/Web/eng/siteeng0.nsf/html/participation-hostilities-ihl-311205, and petitioners' own expert, Professor Gary D. Solis, advocates a definition of "direct participation" that is substantially broader than the one urged by petitioners in their brief, <u>see</u> Pet'rs' Mem., Ex. A (Decl. of Gary D. Solis) ¶ 6(g) (defining "direct participation" to include "senior terrorist leaders and terrorist weapons specialists and fabricators . . . by virtue of their ongoing special skills or senior leadership positions and involvement in or planning of combat operations").

hence, Article 4 and Additional Protocol I do not apply.[15]  Moreover, the government no longer

seeks to detain petitioners on the basis that they are "enemy combatants."  Indeed, the

government's abandonment of this term is an implicit acknowledgment that "[i]n non-

international armed conflict combatant status does not exist."  Int'l Comm. of the Red Cross,

Official Statement: The Relevance of IHL in the Context of Terrorism (July 21, 2005),

http://www.icrc.org/Web/eng/siteeng0.nsf/html/terrorism-ihl-210705.  The treaty authorities that

regulate non-international armed conflicts -- Common Article 3, Additional Protocol II and the

International Committee of the Red Cross's Commentaries on both -- in fact do not "make any

reference whatsoever to the term 'combatant.'"  Gherebi, 2009 WL 1068955, at *18.  Gherebi

correctly observes that "petitioners evidently interpret this lack of protection for 'combatants' in

non-international armed conflicts to mean that every individual associated with the enemy to any

degree in such a conflict must be treated as a civilian."  Id.  Gherebi then explains:

> The Geneva Conventions restrict the conduct of the President in armed conflicts;
> they do not enable it.  And the absence of any language in Common Article 3 and
> Additional Protocol II regarding prisoners of war or combatants means only that
> no one fighting on behalf of an enemy force in a non-international armed conflict
> can lay claim to the protections of such status, not that every signatory to the
> Geneva Conventions must treat the members of an enemy force in a civil war or
> transnational conflict as civilians regardless of how important the members in
> question might be to the command and control of the enemy force or how well
> organized and coordinated that force might be.

Id.

This Court agrees that the lack of combatant status in non-international armed conflicts

does not, by default, result in civilian status for all, even those who are members of enemy

---

[15] In Hamdan v. Rumsfeld, 548 U.S. 557 (2006), the Supreme Court concluded that, at
the very least, Common Article 3 of the Geneva Conventions applies to the United States's
conflict with al Qaeda because it is a "conflict not of an international character."  See id. at 628-
31.

"organizations" like al Qaeda.  Moreover, the government's claimed authority to detain those

who were "part of" those organizations is entirely consistent with the law of war principles that

govern non-international armed conflicts.  Common Article 3, by its very terms, contemplates

the "detention" of "[p]ersons taking no active part in the hostilities, including members of armed

forces who have laid down their weapons and those placed hors de combat," and commands that

they be treated "humanely."  Third Geneva Convention, art. 3(1).  At a minimum, this restriction

establishes that States engaged in non-international armed conflict can detain those who are "part

of" enemy armed groups.  Gherebi, 2009 WL 1068955, at *19.  Similarly, Part IV of Additional

Protocol II, in particular Article 13, sets forth protections for the "civilian population" in non-

international armed conflicts.  See Protocol Additional to the Geneva Conventions of 12 August

1949, and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol

II), Part IV, June 8, 1977, 1125 U.N.T.S. 609 (hereinafter "Additional Protocol II").  Such

protections for "civilians" would be superfluous "if every member of the enemy in a non-

international armed conflict is a civilian."  Gherebi, 2009 WL 1068955, at *20.  The clear

implication of Part IV, then, is that Additional Protocol II recognizes a class of individuals who

are separate and apart from the "civilian population" -- i.e., members of enemy armed groups.

Indeed, it makes clear that "[t]hose who belong to armed forces or armed groups may be attacked

at any time."  Int'l Comm. of the Red Cross, Commentary on the Additional Protocols of 8 June

1977 to the Geneva Conventions of 12 August 1949, at 1453 (Sandoz et al. eds. 1987)

(discussing Article 13 of Additional Protocol II).  As for the practical application of these

principles, historical examples are few and far between.  There are, however, several decisions of

the International Criminal Tribunal for the former Yugoslavia ("ICTY") that have recognized

that, in a non-international armed conflict, membership in an armed group makes one liable to

-14-

attack and incapacitation independent of direct participation in hostilities.  See ICTY Trial

Chamber, Prosecutor v. Galić, Case No. IT-98-29-T, ¶ 47 (Dec. 5, 2003) ("For the purpose of the

protection of victims of armed conflict, the term 'civilian' is defined negatively as anyone who is

not a member of the armed forces or of an organized military group belonging to a party to the

conflict."); ICTY Trial Chamber, Prosecutor v. Blaskic, Case No. IT-95-14-T, ¶ 180 (Mar. 3,

2000) ("Civilians within the meaning of Article 3 are persons who are not, or no longer,

members of the armed forces.").

      In sum, then, the Court agrees with Gherebi and hence rejects petitioners' argument "that

the laws of war permit a state to detain only individuals who 'directly participate' in hostilities in

non-international armed conflicts."  2009 WL 1068955, at *21.  The Court also concludes that

the authority claimed by the government to detain those who were "part of . . . Taliban or al

Qaida forces" is consistent with the law of war.  Even though this portion of the government's

framework is consistent with the law of war, however, the government's position cannot be said

to reflect customary international law because, candidly, none exists on this issue.  See Jean-

Marie Henckaerts, 87 Int'l Rev. of the Red Cross 175, 190 (Mar. 2005) ("[I]t is not clear whether

members of armed opposition groups are civilians who lose their protection from attack when

directly participating in hostilities or whether members of such groups are liable to attack as

such.").  Nonetheless, the Court finds that the government's claimed authority is consistent with,

and is not affirmatively prohibited by, the law of war.  "The laws of war traditionally emphasize

pure associational status as the primary ground for detention; individual conduct provides only a

secondary, alternative predicate."  Robert Chesney & Jack Goldsmith, Terrorism and the

Convergence of Criminal and Military Detention Models, 60 Stan. L. Rev. 1079, 1084 (2008)

(hereinafter "Chesney & Goldsmith").  Here, that is precisely the type of authority claimed by

the Executive, and judicial deference to that decision is entirely appropriate.  See Munaf, 128 S.

Ct. at 2218 (stating that courts traditionally accord deference to the Executive in military and

national security affairs).

In addition to members of al Qaeda and the Taliban, the government's detention authority

also reaches those who were members of "associated forces."  For purposes of these habeas

proceedings, the Court interprets the term "associated forces" to mean "co-belligerents" as that

term is understood under the law of war.[16]  The government itself advocates this reading of the

language.  Resp'ts' Mem. at 7; Tr. at 7-9.  A "co-belligerent" in an international armed conflict

context is a state that has become a "'fully fledged belligerent fighting in association with one or

more belligerent powers.'"  Bradley & Goldsmith, at 2112 (quoting Morris Greenspan, The

Modern Law of Land Warfare 531 (1959)).  One only attains co-belligerent status by violating

the law of neutrality -- i.e., the duty of non-participation and impartiality.  See Michael Bothe,

"The Law of Neutrality," in The Handbook of Humanitarian Law in Armed Conflicts 485 (Dieter

Fleck ed. 1995) (hereinafter "Bothe").  If those duties are violated, then the adversely affected

belligerent is permitted to take reprisals against the ostensibly neutral party.  Id. at 485, 492-94.

This is also consistent with historical practice in the United States.  See Bradley & Goldsmith, at

2111-12 (citing the use of military force against Vichy France, a co-belligerent of Germany, in

World War II).  Accordingly, the government has the authority to detain members of "associated

forces" as long as those forces would be considered co-belligerents under the law of war.[17]

---

[16] Like many other elements of the law of war, co-belligerency is a concept that has developed almost exclusively in the context of international armed conflicts.  However, there is no reason why this principle is not equally applicable to non-state actors involved in non-international conflicts.

[17] "Associated forces" do not include terrorist organizations who merely share an abstract philosophy or even a common purpose with al Qaeda -- there must be an actual association in the

With respect to the criteria to be used in determining whether someone was "part of" the "Taliban or al Qaida or associated forces," the Court will not attempt to set forth an exhaustive list because such determinations must be made on an individualized basis.  But this Court will, by necessity, employ an approach that is more functional than formal, as there are no settled criteria for determining who is a "part of" an organization such as al Qaeda.  Cf. Third Geneva Convention, art. 4(A) (identifying characteristics of membership in the armed forces or militia for purposes of prisoner of war status in an international armed conflict).  "[M]ere sympathy for or association with an enemy organization does not render an individual a member" of that enemy organization.  Gherebi, 2009 WL 1068955, at *21.  The key inquiry, then, is not necessarily whether one self-identifies as a member of the organization (although this could be relevant in some cases), but whether the individual functions or participates within or under the command structure of the organization -- i.e., whether he receives and executes orders or directions.  Id. at *22; Bradley & Goldsmith, at 2114-15.  Thus, as Gherebi observed, this could include an individual "tasked with housing, feeding, or transporting al-Qaeda fighters . . . but an al-Qaeda doctor or cleric, or the father of an al-Qaeda fighter who shelters his son out of familial loyalty, [is likely not detainable] assuming such individuals had no independent role in al-Qaeda's chain of command."  2009 WL 1068955, at *22.  Moreover, as the government conceded at oral argument, its framework does not encompass those individuals who unwittingly become part of the al Qaeda apparatus -- some level of knowledge or intent is required.  See Tr. at 21-22, 37.  These are, of course, non-exclusive factors and the Court's determinations will be made on a case-by-case basis in light of all the facts presented.

---

current conflict with al Qaeda or the Taliban.

**B.      "Or substantially supported"**

As proposed by the government, the detention authority reaches not only those who were "part of" the Taliban, al Qaeda or associated forces, but also individuals who "substantially supported" any of those organizations.  Petitioners argue that "the law of war provides no authority for detention based on 'support' of opposing enemy forces, and respondents cite none." Pet'rs' Mem. at 7.  Consequently, they assert that a "support"-based approach "represents a marked departure from the law of war."  Id.  Because the government's briefs are essentially silent on the origins of the "support" concept in the law of war, the Court pressed for clarification at the April 17 hearing.  Tr. at 11-15, 38-42.  The government initially asserted that the concept of "support" is anchored in the principle of co-belligerency.  Id. at 12.  As discussed above, "support" does have some relevance with respect to co-belligerency and the law of neutrality, but these concepts apply only to enemy forces (i.e., states, armed groups), see Bothe, at 485 ("The duty of non-participation means, above all, that the state must abstain from supporting a party to the conflict.") (emphasis added), and the Court can see no plausible reading of the principle of co-belligerency that would encompass individuals.

After repeated attempts by the Court to elicit a more definitive justification for the "substantial support" concept in the law of war, it became clear that the government has none. Nevertheless, the government asserted that "substantial support" is intended to cover those individuals "who are not technically part of al-Qaeda," but who have some meaningful connection to the organization by, for example, providing financing.  Tr. at 16, 32.  Regardless of the reasonableness of this approach from a policy perspective, a detention authority that sweeps so broadly is simply beyond what the law of war will support.  The government's approach in this respect evidences an importation of principles from the criminal law context.

See Allison M. Danner, Defining Unlawful Enemy Combatant: A Centripetal Story, 43 Tex. Int'l

L.J. 1, 11-12 (2007) (observing that the concept of "support" is borrowed from the federal

criminal code); Chesney & Goldsmith, at 1120-32 (discussing a "convergence trend" in criminal

and military detention models).  Again, although this concept may be attractive from a policy

perspective, and indeed could be the basis for the development of future domestic legislation or

international law, there is at this time no justification -- in the AUMF or the law of war -- for

such an approach.  The law of war permits detention of individuals who were "part of" one of the

organizations targeted by the AUMF.  That is the outer limit of the Executive's detention

authority as stated in the AUMF and consistent with the law of war.  Detaining an individual

who "substantially supports" such an organization, but is not part of it, is simply not authorized

by the AUMF itself or by the law of war.  Hence, the government's reliance on "substantial

support" as a basis for detention independent of membership in the Taliban, al Qaeda or an

associated force is rejected.

     This represents a difference between this Court's approach and that of Judge Walton in

Gherebi.  But as applied in specific cases, the difference should not be great.  Despite the Court's

rejection of "substantial support" as an independent basis for detention, the concept may play a

role under the functional test used to determine who is a "part of" a covered organization.  The

government argues that "[u]nder a functional analysis, individuals who provide substantial

support to al-Qaida forces in other parts of the world may properly be deemed part of al-Qaida

itself."  Resp'ts' Mem. at 7.  Under certain circumstances, that may be so, and the Court certainly

agrees that such evidence would be relevant in determining whether an individual was

functionally a "part of" al Qaeda.  For example, if the evidence demonstrates that an individual

did not identify himself as a member, but undertook certain tasks within the command structure

or rendered frequent substantive assistance to al Qaeda, whether operational, financial or

otherwise, then a court might conclude that he was a "part of" the organization.  Of course, such

determinations are highly fact-intensive and will be made on an individualized, case-by-case

basis, applying the conclusions reflected in this decision.

**II.     Authority to detain "any person who has committed a belligerent act, or has directly supported hostilities"**

For essentially the same reasons, the Court also finds that the government's detention

authority does not extend to those individuals who have only "directly supported hostilities."

Although this language received considerably less attention in the briefing and at argument, it

suffers from the same deficiency already identified -- detaining an individual solely on the basis

that he "directly supported hostilities" is inconsistent with the law of war.  The government does,

however, have the authority to detain "any person who has committed a belligerent act."  And

just as the Court will consider evidence relating to "substantial support" of covered organizations

in assessing whether an individual was functionally "part of" the organization, so, too, will it

consider evidence of "direct support" for hostilities in assessing whether an individual

"committed a belligerent act."

For purposes of these habeas proceedings, the Court interprets the phrase "committed a

belligerent act" to cover any person who has directly participated in hostilities.  That conclusion

is consistent with the law of war.  See Additional Protocol II, art. 13(3) (stating that civilians

shall not be subject to military force "unless and for such time as they take a direct part in

hostilities"); Additional Protocol I, art. 51(3) (same).  As the Court has noted above, see n.14

supra, the precise scope of the phrase "direct participation in hostilities" remains unsettled and

the International Committee of the Red Cross is coordinating an effort among experts "to clarify

the precise meaning of the notion of 'direct participation in hostilities', which has never been

defined in treaty law."  ICRC, Report: Direct Participation in Hostilities.  In these proceedings, the Court will rely on the settled aspects of the standard.  "[L]ittle doubt exists that a civilian carrying out an attack would be directly participating in hostilities.  In the same vein, legal experts seem to agree that civilians preparing or returning from combat operations are still considered to be directly participating in hostilities, although precise indication as to when preparation begins and return ends remains controversial."  Id.  But any further refinement of the concept of "direct participation" will await examination of particular cases.

## CONCLUSION

As Hamdi foretold, drawing the "permissible bounds" of the government's detention authority can only truly occur as courts consider the unique facts of each individual case as they are presented.  542 U.S. at 522 n.1.  However, the foregoing analysis and interpretation of the government's authority to detain sets forth some guidance for the parties in that process.  After careful consideration, the Court is satisfied that the government's detention authority is generally consistent with the authority conferred upon the President by the AUMF and the core law of war principles that govern non-international armed conflicts.  In those instances where the government's framework has exceeded that which is permitted by the law of war -- specifically with respect to the concept of "support" -- the Court rejects such bases for detention.  Therefore, the Court concludes that under the AUMF the President has the authority to detain persons that the President determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, and persons who harbored those responsible for those attacks.  The President also has the authority to detain persons who are or were part of Taliban or al Qaeda forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed (i.e., directly participated in) a

belligerent act in aid of such enemy armed forces.


                                            /s/ John D. Bates
                                          JOHN D. BATES
                                    United States District Judge


Dated:   May 19, 2009